

# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

RHONDA A. JIMERSON,               :          CIVIL ACTION

    Plaintiff,                :

        v.                 :

INTERNATIONAL LONGSHOREMEN'S      :
ASSOCIATION, LOCAL 1423,
                   :

    Defendant.                          NO. CV205-101

## O R D E R

Plaintiff, Rhonda A. Jimerson, filed the above-captioned case against Defendant, International Longshoremen's Association, Local 1423 ("Local 1423" or the "union"), asserting federal employment discrimination claims for sexual harassment and retaliation.

Presently before the Court is the union's motion to dismiss and motion for summary judgment. Because Jimerson states a claim upon which relief can be granted, the motion to dismiss will be **DENIED**. Because genuine issues of material fact exist as to some, but not all, of Jimerson's claims, the

AO 72A
(Rev. 8/82)

motion for summary judgment will be **GRANTED** in part, and **DENIED** in part.

## BACKGROUND

Local 1423 is a labor organization representing laborers who work for various stevedoring companies in the Port of Brunswick, Georgia.  The union operates through a collective bargaining agreement with the Georgia Stevedoring Association, which is a multi-employer trade group.  The officers of the union perform regular longshoremen's work, and receive a stipend each month for their union duties, ranging from $125 to $1,000.

Upon request by the shipping companies, Local 1423 refers union members for work.  To facilitate these assignments, the union operates a hiring hall.  Once on board the ship, longshoremen work in "gangs" under the immediate supervision of a "header."  Headers are selected by the stevedoring company with the concurrence of the union.  According to Jimerson, the header represents the interests of union members while on the job.  Jimerson contends that union officers instruct rank and file longshoremen not to answer to stevedore management

2

officials directly.  Rather, company officials are supposed to work with and through the header.

Gangs are formed at the union hall at events called "shape-ups."  Shape-ups occur an hour before work is scheduled to start, and are conducted under the supervision of the union's business agent, James C. Reid, Jr.  Longshoremen are selected for placement in gangs in order of their seniority.

Local 1423 contends that if a worker cannot report for work, she is expected to find a replacement or let someone at the union hall know of her absence.  To the contrary, Jimerson asserts that a union member is not responsible for finding her own replacement.  Instead, Jimerson contends that the header completes this task if any worker is more than five minutes late to a job site.

Longshoremen are subject to discipline under the union bylaws and the collective bargaining agreement if they use abusive language or if they sexually harass fellow union members.  Local 1423 concedes that, if possible, discipline for such conduct is imposed at the union level.  If discipline concerns a matter covered by the collective bargaining agreement, a disciplined longshoreman may appeal any decision

3

made by Local 1423 to the Port Grievance Committee, which is comprised of two union officials and two management officials.

Jimerson, a union member, claims that six members of Local 1423, including her co-workers and supervisors, sexually harassed her on a continuing basis from 2000 through 2005. The men she accuses of this conduct are Leonard Butler, Willie Bacon, Terrell Carmena, Maurice Butler, Max Mingo, and Willie Merrell. In addition, Jimerson accuses Local 1423 president, Winford Hill, and the business agent, Reid, of ignoring her complaints of harassment and retaliating against her.

According to Jimerson, Leonard Butler began harassing her the year she became a member of the union, in 2000. Jimerson maintains that Butler harassed her for taking certain jobs because she was a woman. Specifically, Jimerson maintains that shortly after August 24, 2000, Butler followed her around, yelling: "Don't take your ass to Savannah taking jobs you can't do. You're fucking up my job." Compl. ¶ 11.

Jimerson had worked with tractors in Savannah on August 24, 2000, and she alleged that Butler was suggesting that she was incapable of doing this work because of her sex. Jimerson also faulted Butler for acting belligerently on other occasions, by screaming at her, yelling obscenities, and

attempting to intimidate her by driving forklifts perilously close to her person.

On December 15, 2000, Jimerson alleges that a fellow laborer, Wanda Richardson, and the header on a job site, Willie "Bait" Bacon, approached Jimerson.  Richardson then told Jimerson that Bacon would pay Jimerson five hundred dollars in return for sexual favors.  Richardson stated that all Jimerson would have to do was "take Bait back in the hole," and pointed to a stairwell, explaining that it would only take Jimerson five minutes.  Compl. ¶ 14.

Jimerson posits that Richardson made these comments at Bacon's behest.  When Jimerson declined Bacon's advances, Jimerson stated that Bacon became incensed and engaged in other acts of harassment against her.  Specifically, Bacon exclaimed that Jimerson did not have on steel-toed shoes, and although Jimerson told Bacon that he was incorrect, Bacon proceeded to cut her shoes from end to end.

On February 28, 2001, and October 13, 2001, Jimerson alleges that her supervisor, Terrell Carmena, made lewd, sexually derogatory comments to her and sexually propositioned her.  In February 2001, Carmena told Jimerson that he would "lick her pussy to her asshole so good you'll look for me in

AO 72A
(Rev. 8/82)

the daytime with a flashlight." Compl. ¶ 16. In October of that year, Carmena was on a wagon with a group of longshoremen, including Jimerson, and he stated that "some women claim they don't suck on brown apples, when they do it all." When one of Jimerson's co-workers protested that "Rhonda doesn't need to hear that," Carmena responded that "she's the main one I'm talking about. I know she's doing it, too." Compl. ¶¶ 20 & 21.

Jimerson also claims that a fellow worker, Maurice Butler, made sexually suggestive comments to her around March 2003. Specifically, Butler told Jimerson that Geraldine Miller "told me you come in your pants whenever you see me." Compl. ¶ 22. On another occasion, Butler suggested to Jimerson that she should move in with him and "get in one of his beds." Thereafter, Butler began hitting her on top of her hard hat every time she came aboard a paper ship. Jimerson suggests that this physical invasion would not have occurred had she accepted Butler's sexual advances.

As additional instances of harassment, Jimerson reported that Carmena and Maurice Butler attempted to get others to fire her from jobs, or to refuse to hire her at all. Compl. ¶¶ 19, 25, & 26.

Jimerson also related that Willie Merrell, a header, also harassed her.  On November 2, 2004, Merrell told Jimerson that "If Lonnie [Jimerson's husband and co-worker] isn't acting right, I'll be glad to step in and tighten you up."  Compl. ¶ 41.  The next day, Merrell allegedly separated Jimerson from working with a female longshoreman.  Jimerson avers that this workplace assignment was made because of her sex.  Although Jimerson complained to the union's business agent, the work assignment was not altered.  Merrell also told Jimerson that he was "harder than the tractors on the ship.  If Lonnie can't get you pregnant, I can."  Compl. ¶ 42.  This comment was made by Merrell when he was Jimerson's co-worker, not a header, and allegedly occurred during late 2003.

Jimerson, who is black, asserts that on October 30, 2004, Max Mingo made harassing remarks to her about "what he'd like to do with some chocolate swirl."  Jimerson has stated that there were other incidents of harassment by all six men, and that the harassment occurred on a daily basis through 2005.  For instance, Jimerson stated in a form that she submitted to the Equal Employment Opportunity Commission ("EEOC") that Mingo propositioned her every day.  She has made similar claims of

7

ongoing harassment by Bacon, Leonard Butler, Maurice Butler, Carmena, and Merrell.

Under Local 1423's bylaws and the collective bargaining agreement, complaints of harassment must be reported either to the header, the local office, or to the local union's officers. However, Jimerson maintains that her repeated complaints were ineffective, and led to retaliation against her by union officers.  Jimerson alleges that some union members were paid during their supposed "suspensions" for their conduct toward her, which encouraged the harassment.

On December 26, 2003, Jimerson did not show up for work, or call and let anyone know that she would be absent.  Although Jimerson later explained to union officials that she had a flat tire, and that no one was available for her to call, the union decided to suspend her for seven days for her conduct. Jimerson alleges that this suspension was discriminatory because other longshoremen, who did not complain of harassment, were not suspended for their failure to report to a work site.

For example, Jimerson avers that the business agent, Reid, often accepted jobs where he was required to be present at the start of the work day, but that he did not in fact show up. Jimerson maintains that Reid was fired on multiple occasions

8

by a stevedoring company for not being at work on time, but that Reid received no punishment by the union for this conduct.

On October 6, 2004, Jimerson complains that another instance of retaliation occurred based on her complaints to Hill and Reid.  According to Plaintiff, on this date, a header hired her to operate a forklift.  Although she asserts that she was a qualified and certified forklift operator, the header fired her after an hour because she had complained about the harassment she faced.

On June 1, 2004, Jimerson filed a charge questionnaire with the EEOC asserting that Local 1423 was responsible for sexual harassment.  On November 1, 2004, Jimerson filed her perfected charge of discrimination with the federal agency.


## DISCUSSION

The union argues that Jimerson's complaint fails to state a claim against it because the employer, not the union, is the entity responsible for sexual harassment in the workplace.  It also argues that many of Jimerson's claims are untimely, and that those claims that are timely are not severe enough to qualify as harassment under the law.  The Court will consider each argument in turn.

AO 72A
(Rev. 8/82)

I.   **MOTION TO DISMISS**

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a defendant to move to dismiss a complaint on the ground that the plaintiff has failed to state a claim upon which relief can be granted.  A motion under Rule 12(b)(6) attacks the legal sufficiency of the complaint.  In essence, the movant says, "Even if everything you allege is true, the law affords you no relief."

Consequently, in determining the merits of a Rule 12(b)(6) motion, a court must assume that all of the factual allegations of the complaint are true, e.g., United States v. Gaubert, 111 S. Ct. 1267, 1276 (1991), and construe the allegations in the light most favorable to the plaintiff, e.g., Sofarelli v. Pinellas County, 931 F.2d 718, 721 (11th Cir. 1991).  "A complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the [complainant] can prove no set of facts in support of his claim which would entitle him to relief."  United States v. Baxter Int'l, Inc., 345 F.3d 866, 880 (11th Cir. 2003).

Title VII provides, in pertinent part, that "[i]t shall be an unlawful employment practice for a labor organization — (1) to exclude or to expel from its membership, or otherwise to

discriminate against, any individual because of his race, color, religion, sex, or national origin[.]"  42 U.S.C.A. § 2000e-2(c) (2003).

The union argues that the employer is responsible for policing allegations of sexual harassment in the workplace, not the union.  Local 1423 maintains that it may be liable under Title VII only if it fails to file a grievance on the victim's behalf with the employer.  EEOC v. Pipefitters Ass'n Local Union 597, 334 F.3d 656, 659 (7th Cir. 2003); Thorn v. Amalgamated Transit Union, 305 F.3d 826, 833 (8th Cir. 2002).

However, Jimerson alleges more than mere passive acquiescence in discrimination by the employer and its agents. Rather, Jimerson contends that union officials and members are responsible for repeated, continuous instances of sexual harassment, and were the perpetrators of the wrongdoing.  As the parties agree, the union's constitution, by-laws, and collective bargaining agreement give Local 1423 the authority to punish sexual harassment by union members with fines and suspensions.  The union's past discipline of Jimerson's co-workers on certain occasions for using abusive language demonstrates that such discipline was within Local 1423's scope of authority.  According to Jimerson, the union's officers have

11

failed to stop the harassment, and have instead retaliated against her.   As a result, <u>Pipefitters</u> and <u>Thorn</u> are distinguishable.[1]

Moreover, Jimerson asserts that the union acts as the functional equivalent of an employer, given that Local 1423 members work for various shipping companies, but only for one union, and that union president Hill informs members on a regular basis that the union controls hiring, not the employers.

The Court is cognizant that whether a union has a sufficient connection with a discriminatory practice such that it is appropriate to hold it liable is ordinarily a question of fact.  <u>Howard v. Int'l Molders & Allied Workers Union</u>, 779 F.2d 1546, 1548 & 1553 (11th Cir. 1986); <u>see</u> <u>also</u> <u>Alsup v. Int'l Union of Bricklayers & Allied Craftsmen</u>, 679 F. Supp. 716, 722 (N.D. Oh. 1987)(liability of union depends on whether

---

[1]    Indeed, the <u>Pipefitters</u> court recognized as much when it explained that "<u>this</u> union's power over personnel and work rules is so much more limited than the employer's; other unions, operating under other collective bargaining agreements, might be delegated additional powers that would alter the analysis in this opinion." <u>Pipefitters Ass'n Local Union 597</u>, 334 F.3d at 661; <u>see</u> <u>also</u> <u>id</u>. at 663 (Rovner, J., dissenting) ("Where the facts reveal that, in practice, the union enjoys significant control over working conditions and has the power to correct workplace inequities, it is appropriate to hold it liable for failing to do so on the same basis as the employer.").

matter complained of is within its purview or scope of authority).

If what Jimerson avers is true, Local 1423 may be responsible for sexual harassment under Title VII. <u>See</u> 42 U.S.C.A. § 2000e-2(c)(1) (prohibiting a labor union from discriminating against an individual because of her sex); 42 U.S.C.A. § 2000e-3(a) (prohibiting a labor union from retaliating against a person for complaining about unlawful workplace discrimination) (2003). As a result, Jimerson's sexual harassment claim against the union is not deficient as a matter of law.


**II.  MOTION FOR SUMMARY JUDGMENT**

Federal Rule of Civil Procedure 56(c) provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

13

The Court must view the facts in the light most favorable to the non-moving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in his favor. . . ", <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428, 1437 (11th Cir. 1991)(en banc)(internal quotation marks omitted).

## A.   <u>Hostile Work Environment</u>

### 1.   Statute of Limitations

In general, federal law requires workers to notify the EEOC of any workplace discrimination within 180 days of the alleged discriminatory event, or such conduct is not actionable.   42 U.S.C.A. § 2000e-5(e)(1) (2003).

Yet, unlike cases where a woman is fired because of her sex, discrimination under a "hostile work environment" legal theory does not occur on any one particular day.   Because this cause of action accrues gradually over time, strict compliance with the limitations deadline is not required.   Rather, so long as part of the harassment occurred within the 180 day period, liability for the older incidents may attach as well.   <u>See</u> <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 115-120 (2002).

14

AO 72A
(Rev. 8/82)

Local 1423 argues that the events that were asserted by Jimerson in a timely fashion do not qualify as sexual harassment, and that the older incidents are not actionable because they are not related to the more recent allegations. When confronted with such an argument, "[a] court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." Id. at 120.

If an act beyond the 180 day window had no relation to acts occurring within the statutory period, or if the prior acts were not part of the same hostile work environment claim because of the intervening acts of the employer, "then the employee cannot recover for the previous acts[.]" Id. at 118. A series of harassing conduct comprises the same hostile work environment where "the pre- and post-limitations period incidents involved the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." Id. at 120 (citation omitted).

Although Jimerson's perfected charge of discrimination was filed on November 1, 2004, the 180 day limitations period did not begin to run in May 2004, as Local 1423 suggests. Rather,

a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of.   A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein.   Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received.

29 C.F.R. § 1601.12(b) (2005).

Jimerson filed a charge questionnaire describing her complaints with the EEOC on June 1, 2004.  Thus, any harassing conduct that occurred within 180 days of this date is raised in a timely manner, and any prior conduct related to the events occurring on or after December 4, 2003, may also serve as part of Jimerson's hostile work environment claim.

Jimerson reported two incidents by Willie Merrell that she alleges were discriminatory and occurred within the limitations period.  According to Jimerson, on November 2, 2004, Merrell told Jimerson that "If Lonnie [Jimerson's husband and co-worker] isn't acting right, I'll be glad to step in and tighten you up."  Compl. ¶ 41.  The next day, Merrell allegedly separated Jimerson from working with another female union member because of Jimerson's sex.  Although Jimerson complained

16

to the union's business agent about Merrell's actions, she avers that nothing was done about Merrell's conduct.

According to Jimerson, on October 30, 2004, Max Mingo made harassing remarks to Jimerson about "what he'd like to do with some chocolate swirl." Compl. ¶ 40.  In Jimerson's complaint, she related that Merrell and Mingo were emboldened to harass her based on the fact that other union members had gotten away with similar harassment of Jimerson on previous occasions.  As a result, their conduct is related to the alleged prior harassment of Jimerson by Leonard Butler, Maurice Butler, Bacon, and Carmena.

In addition, Jimerson has stated that Mingo, Bacon, Leonard Butler, Maurice Butler, Carmena, and Merrell propositioned and harassed her on a daily basis from 2000 through 2005.  Consequently, the harassing conduct by these men occurring prior to December 4, 2003, is related to the conduct occurring on and after that date, and may serve as part of the same hostile work environment claim.

If what Jimerson alleges is true, the harassment occurred frequently and was widespread.  The specific incidences alleged have been described above, and need not be reexamined in detail here to find that a sufficient connection exists between these

17

events to consider them part of the same hostile work environment claim or pattern of conduct.

While it is true that pre-limitations period acts cannot constitute part of the same hostile work environment when the defendant intervenes to correct the problem, <u>Watson v. Blue Circle, Inc.</u>, 324 F.3d 1252, 1258 (11th Cir. 2003), there is some evidence in this case that Local 1423 refused Jimerson's repeated demands to put a stop to the harassment. Plaintiff maintains that union officials laughed at her predicament, and began retaliating against her, when she informed them of the wrongdoing.[2]

Consequently, all the conduct alleged may be considered together in determining whether a hostile work environment existed.

### 2.   Merits of Jimerson's Sexual Harassment Allegations

Title VII of the Civil Rights Act of 1964 makes it

an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges

---

[2]
The Court notes that Local 1423 argues that Jimerson failed to follow its grievance procedure correctly, and did not write out her complaints in a formal manner on each occasion. However, whether Jimerson's compliance with the union's grievance procedure was reasonable is a question of fact. <u>Breda v. Wolf Camera & Video</u>, 222 F.3d 886, 890 (11th Cir. 2000).

AO 72A
(Rev. 8/82)

of employment, because of such individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).  . . .   When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' 477 U.S. at 65, that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' id., at 67 (internal brackets and quotation marks omitted), Title VII is violated.

This standard . . . takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury.

. . .

[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 23 (1993).[3]

The employer, or labor organization, may be vicariously liable when a supervisor of the victimized employee creates the hostile work environment.  Importantly, though, when no adverse employment action is taken against the victim of harassment, the defending organization or entity may raise an affirmative defense to escape liability.  To prevail, the labor organization must show (1) that it used "reasonable care to prevent and correct promptly any sexually harassing behavior,"

---

[3]

No single factor is determinative.  Id.

AO 72A
(Rev. 8/82)

and (2) that the employee acted <u>unreasonably</u> in failing to avail herself of the union's preventive and corrective opportunities.  <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807 (1998).

In contrast, when the harassment is perpetrated by a co-worker, the <u>employee</u> has the burden of proving that the employer or labor organization knew or should have known about the harassing conduct.  If the plaintiff can demonstrate that the defendant acted negligently in failing to correct the co-workers' harassment, then the union may be responsible for the co-workers' conduct.  <u>Breda</u>, 222 F.3d at 889.

Local 1423 argues that Jimerson's complaints of sexual harassment are not severe or pervasive, and that there is no basis for concluding that the union is responsible for any of the alleged conduct.  To consider this argument, the Court must describe and summarize Jimerson's allegations of harassment and determine whether the conduct should be labeled "mere offensive utterances" as a matter of law.

Jimerson asserts that Bacon, her supervisor, propositioned her for sex, and then cut her shoes to harass her for her refusal to engage in sexual intercourse with him on the job

site.  Viewing the evidence in the light most favorable to the nonmoving party, this sort of conduct supports Jimerson's hostile work environment claim.

Although the union concedes that header Carmena's statements were sexual in nature, it denies that his statements were severe or pervasive enough to alter the terms and conditions of Jimerson's employment.  The Court rejects Local 1423's attempt to view this supervisor's statements in isolation.  Rather, governing law instructs that the Court must consider the incidents together.  Harris, 510 U.S. at 23. Carmena's comments may be considered in determining whether the "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the conditions'" of the Jimerson's employment.  Id. at 21 (internal citations omitted).

According to Jimerson, her supervisor, Merrell, propositioned her for sex on multiple occasions, and after she refused, he forbade her from working with another female longshoreman.  If what Jimerson asserts is true, this work assignment was based solely on her sex and her refusal to accede to her supervisor's sexual demands.  Merrell's conduct may have contributed to a hostile work environment.

21

Because Bacon, Carmena, and Merrell were Jimerson's supervisors, the union has the burden of proving that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and . . . that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities[.]" <u>Ellerth</u>, 524 U.S. at 765.

The union has failed to meet this standard as a matter of law. Rather, the evidence permits an inference that Local 1423 may not have acted reasonably in preventing and correcting the harassment. Moreover, whether Jimerson acted reasonably in complying with the union's grievance procedure is a question of fact. <u>See</u> note 2, <u>supra</u>, and discussion, <u>infra</u>, at 25-27.

Regarding the actions of Jimerson's co-workers, the comments made by Leonard Butler may have been motivated by an animus based on Jimerson's sex. Jimerson stated that Butler cursed and screamed at her because she was taking jobs she was "unqualified for" because of her sex. Compl. ¶ 11. She also asserted that he tried to intimidate her by driving forklifts dangerously close to her. Drawing all justifiable inferences in Plaintiff's favor, Leonard Butler's conduct, while perhaps not so extreme as to create a hostile work environment on its

22

own, tends to support Jimerson's hostile work environment theory when considering all the incidents together.

Local 1423 argues that Maurice Butler's conduct does not qualify as sexual harassment.   Yet, Jimerson reported that Maurice Butler told her that "you come in your pants whenever you see me" and suggested that Jimerson should "get in one of his beds."   Compl. ¶ 22.   When Jimerson refused Butler's advances, Jimerson reported that he physically struck her each time she boarded a paper ship that he was aboard.   The Court is not able to conclude that this sort of frequent physical invasion was <u>not</u> "physically threatening or humiliating" as a matter of law.   <u>Harris</u>, 510 U.S. at 23.

Local 1423 also argues that Max Mingo's comment to Jimerson about "what he'd like to do with some chocolate swirl" was not sexual in nature.   However, drawing all inferences in light most favorable to the nonmoving party, the Court agrees that this comment may have been meant as crude reference of a sexual nature.   While this remark, standing alone, might qualify as mere vulgar banter, it may be considered with the other evidence in determining whether a hostile work environment existed.

23

AO 72A
(Rev. 8/82)

With respect to the comments of Leonard Butler, Maurice Butler, and Mingo, Jimerson has presented some evidence that union officials knew or should have known of Jimerson's co-workers' harassment. The union may have constructive notice of harassment when it occurs daily, in the presence of others, including management or other responsible officials in the organization. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1278-79 (11th Cir. 2002). If the jury credits Jimerson's version of the events, it may determine that Local 1423 acted negligently in failing to correct the harassment Jimerson experienced at the hands of her co-workers. Breda, 222 F.3d at 889.

Local 1423 argues that, with respect to all the conduct complained of by Jimerson, including the comments made by supervisors and co-workers, it exercised reasonable care to prevent harassment and to eliminate it when it occurred, and that Jimerson failed to act with reasonable care to take advantage of the union's established safeguards to prevent harassment.

The union emphasizes that the bargaining agreement between Local 1423 and Georgia Stevedoring Association prohibits harassment, and provides a mechanism for an employee to file

24

a grievance regarding such conduct with Local 1423.  According to Local 1423, it takes such complaints seriously, as demonstrated by the suspensions it meted out to Carmena and Maurice Butler regarding their abusive language used toward Jimerson.[4]

Because Jimerson did not file a formal grievance with respect to some of the incidents she has alleged in her complaint, the union argues that she cannot now complain of the alleged harassment.  Jimerson rejoins that she was threatened and retaliated against whenever she complained of the harassment and urges that it would have been futile for her to continue to make formal complaints in light of the union officers' conduct.  Indeed, under certain circumstances, an employee's non-compliance with an internal grievance procedure may be reasonable.  Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1314 (11th Cir. 2001).

Specifically, Jimerson asserts that in 2000 and 2001, she complained about the harassment perpetrated by Carmena and Leonard Butler, but that Hill and Reid laughed at her and did

---

[4]

Jimerson denies that Carmena was disciplined for his actions toward her, and asserts that Butler was actually paid during his supposed suspension.  In sum, Jimerson maintains that the union's grievance procedure was woefully ineffective in combating harassment.

nothing to correct the behavior of either man.  Jimerson also
contends that in 2001, a member of the union's executive board
asked her to drop a grievance against Carmena, and assured her
that the executive board would ensure that Carmena ceased his
behavior.  Jimerson maintains that, although she dropped the
complaint, the harassment from Carmena continued unabated.
Additionally, Jimerson faults the union president and business
agent in general for doing nothing meaningful to stop the
harassment, despite her repeated complaints.

Where union officers have persuaded the harassed employee
not to pursue a complaint, her failure to insist on pursuing
the grievance is not fatal to her case.  Id. at 1316.  Whether
Jimerson complied with Local 1423's complaint procedure in a
reasonable manner is a question of fact for a jury to
determine.  Breda, 222 F.3d at 890.

As Defendant notes, Plaintiff's complaint is not a model
of clarity in all particulars.  Yet, Jimerson alleges enough
to make out a viable cause of action, and she has provided
sufficient support through affidavits and other admissible
evidence to demonstrate triable issues of fact.  In sum,
considering all the incidents together, there is some evidence
that supports Jimerson's contention that the harassment was

widespread, continuous, and sufficiently severe or pervasive so as to unreasonably interfere with Jimerson's work performance.

Thus, summary judgment in Local 1423's favor is not warranted on Jimerson's hostile work environment claim. See, e.g., Smith v. Norwest Fin. Acceptance, Inc., 129 F.3d 1408, 1418-19 (10th Cir. 1997); Smith v. St. Louis Univ., 109 F.3d 1261 (8th Cir. 1997).[5]

**B.   Retaliation**

**1.   Statute of Limitations**

As discussed, the important date for considering the timeliness of Jimerson's discrimination claims is December 4, 2003, which was 180 days prior to the filing of her initial questionnaire with the EEOC.   Any retaliation claims that

---

[5]

Plaintiff has produced no evidence, nor even made any specific allegation, to support the legal conclusion in her complaint that quid pro quo sexual harassment occurred.   To establish a quid pro quo claim, a plaintiff must demonstrate that giving into an employer's sexual demands is the cost of gaining a job benefit or avoiding an adverse employment action. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986).   An unfulfilled threat of an adverse employment action if a sexual demand is not acceded to does not support a quid pro quo claim, but instead constitutes evidence that may establish a hostile work environment. Ellerth, 524 U.S. at 751-52.   Consequently, summary judgment is warranted in Local 1423's favor on Jimerson's quid pro quo claim.

AO 72A
(Rev. 8/82)

occurred on or after that date are cognizable under the law. 42 U.S.C.A. § 2000e-5(e)(1) (2003).

Unlike the hostile work environment theory, though, acts of retaliation are <u>discrete</u> incidents that become actionable on the day they occur, and cannot be pursued "if time barred, even when they are related to acts alleged in timely filed charges." <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 113 (2002). As a result, Jimerson's allegations of retaliation occurring prior to December 4, 2003, are time-barred, and summary judgment is appropriate in the union's favor as to those claims.


**2.   Merits of Jimerson's Timely Claims of Retaliation**

To make out a prima facie case for retaliation, the plaintiff must show (1) that she made some statutorily protected expression, (2) an adverse employment action, and (3) a casual link between the protected expression and the adverse action.   <u>See</u> <u>Olmstead v. Taco Bell Corp</u>, 141 F.3d 1457, 1460 (11th Cir. 1998).

When retaliation is alleged in a case involving sexual harassment, the Court must apply the <u>McDonnell Douglas</u> burden

28

shifting framework. <u>Johnson v. Booker T. Washington Broad.</u> <u>Serv., Inc.</u>, 234 F.3d 501, 511 n.10 (11th Cir. 2000).

Jimerson asserts two separate instances of retaliation based on her complaints of sexual harassment. On March 5, 2004, Jimerson was suspended for not reporting to work or securing a replacement. Jimerson argues that other union members were not subject to similar punishment, and that she was disciplined only because of her complaints of harassment.

Local 1423 suggests that Jimerson does not set forth a prima facie case of retaliation as to this claim. However, a suspension qualifies as an adverse employment action. The term "adverse employment action" is "broadly defined and as a matter of law includes not only discharges, but also demotions, refusals to hire, refusals to promote, and reprimands." <u>Boothe</u> <u>v. Henderson</u>, 31 F. Supp. 2d 988, 996 (S.D. Ga. 1998). If Jimerson was suspended because of her sexual harassment complaints, then she has established a prima facie case of retaliation.

Moreover, contrary to the union's argument, Defendant may be liable for the suspension, even though this discipline was eventually upheld, and increased, by the Port Grievance Committee. Liability may attach because, under the facts as

29

described by the parties, the Port Grievance Committee has appellate jurisdiction only, and any discipline begins with union decision makers.    The fact that the Port Grievance Committee upheld the allegedly discriminatory action does not remove Local 1423's responsibility for its allegedly uneven and discriminatory suspension practices.

The Court recognizes that Local 1423 has produced evidence that there was a legitimate reason for the discipline, Jimerson's failure to call in to notify anyone of her absence. Still, Jimerson has produced some evidence that this justification is pretextual, creating an issue of fact for trial.

Jimerson has adduced sufficient evidence that would give a jury a reasonable basis to disbelieve the union's proffered reason for the suspension.    She has asserted that the union hall was not open, and that Local 1423 officers refused to give their personal numbers to her.    Jimerson asserts that the union's proffered justification was offered as a stratagem to shroud its true purpose of retaliation.    If a jury credits Jimerson's view of the evidence, it may decide that Local 1423's rationale is unworthy of credence.    <u>Ross v. Rhodes Furniture, Inc.</u>, 146 F.3d 1286, 1291 (11th Cir. 1998).

Jimerson also contends that, on October 6, 2004, a header named Sams fired her from a forklift operating job because of her complaints of harassment.  With respect to this incident, Local 1423 has presented legitimate reasons that justify Sams' decision to fire Jimerson — it asserts that a stevedore company official informed Sams that Jimerson was operating the machine incorrectly, and that the official told Sams to "do something about it."

Nonetheless, Jimerson has presented some evidence that Sams fired her in retaliation for her numerous complaints to Reid and Hill, and that the proffered justification was pretextual.  Jimerson maintains that she was a qualified and certified forklift operator, and that she was operating the forklift properly at all times on this date.  If Jimerson can establish that Sams was aware of the complaints she made against Reid and Hill, and that these complaints were made around the time the firing took place, then unlawful retaliation may have occurred.  Brochu v. City of Riviera Beach, 304 F.3d 1144, 1156 (11th Cir. 2002).

In short, there are disputed issues of fact regarding these two instances of retaliation alleged by Jimerson.

AO 72A
(Rev. 8/82)

**CONCLUSION**

For the reasons explained above, Local 1423's motion to dismiss is **DENIED**.  The union's motion for summary judgment is **GRANTED** in part, and **DENIED** in part.  See Dkt. No. 17.  As to Jimerson's hostile work environment claim and as to those retaliation claims occurring on or after December 4, 2003, the motion is **DENIED**.  Regarding the earlier retaliation claims, and Jimerson's quid pro quo sexual harassment claim, the motion is **GRANTED**.

**SO ORDERED**, this _____22_____ day of December, 2005.


_____
JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)