# In the United States District Court
## for the Southern District of Georgia
## Brunswick Division



RHONDA A. JIMERSON,                :            CIVIL ACTION

    Plaintiff,                :

        v.                :

INTERNATIONAL LONGSHOREMEN'S   :
ASSOCIATION, LOCAL 1423,

                :

    Defendant.                NO. CV205-101

## O R D E R

Plaintiff, Rhonda A. Jimerson, filed the above-captioned case against Defendant, International Longshoremen's Association, Local 1423 ("Local 1423" or the "union"), asserting federal employment discrimination claims for sexual harassment and retaliation.

On December 22, 2005, the Court denied Defendants' motion to dismiss and granted in part and denied in part Defendant's motion for summary judgment. The Court found that there was no evidence that Jimerson suffered any quid pro quo sexual harassment, and that the statute of limitations had elapsed

AO 72A
(Rev. 8/82)

with respect to any retaliation claims occurring before December 4, 2003. On the other hand, the Court determined that there was a genuine issue of material fact regarding the union's liability under a hostile work environment theory. The Court also held that any retaliation occurring on or after December 4, 2003, was legally cognizable.

The case is before the Court on the union's renewed motion for summary judgment. Because there are no genuine issues of material fact in dispute regarding Jimerson's retaliation claims, and the union is entitled to judgment as a matter of law as to those claims, summary judgment will be **GRANTED** in part. Because genuine issues of material fact remain in dispute regarding Jimerson's hostile work environment claim, the motion will be **DENIED** in part.


**BACKGROUND**

Local 1423 is a labor organization representing longshoremen who work for various stevedoring companies at the Port of Brunswick. The union's operations are governed by a collective bargaining agreement with the Georgia Stevedoring Association, a multi-employer trade group.

2

AO 72A
(Rev. 8/82)

Local 1423 refers union members for work when needed by stevedoring companies to load or unload shipping vessels. To facilitate these assignments, the union operates a hiring hall. At the union hall, groups of workers are selected for stevedoring jobs during events called "shape-ups." Shape-ups occur about an hour before work is scheduled to start, and are conducted under the supervision of the union's business agent, James C. Reid, Jr., or another union official. Longshoremen are selected for jobs in order of their seniority. Union members are given seniority cards, which are grouped alphabetically, from "A" to "Q." Jimerson holds a "M" seniority card, and is entitled to be selected for work prior to less senior union members and casual laborers, who hold no seniority card.

Once on board a ship, longshoremen work under the immediate supervision of a "header." Headers are longshoremen selected for the role by the stevedoring company, with the concurrence of union officials. According to Jimerson, the header represents the union members' interests while on the job. Jimerson contends that union officers instruct rank and file longshoremen not to answer to stevedore management

AO 72A
(Rev. 8/82)

officials directly.  Rather, company officials are supposed to work with and through the header.

Longshoremen are subject to discipline under the union bylaws and the collective bargaining agreement if they use abusive language or if they sexually harass fellow union members.  If discipline is imposed that relates to a matter covered by the collective bargaining agreement, the disciplined longshoreman may appeal any decision made by Local 1423 to the Port Grievance Committee.  This committee is comprised of equal numbers of union and management officials.

Jimerson claims that twelve members of Local 1423, including supervisors and co-workers, sexually harassed her on a continuing basis, from 2000 through 2006.  The men who allegedly engaged in this conduct are Leonard Butler, Willie Bacon, Terrell Carmena, Maurice Butler, Max Mango, Willie Merrell, Samuel Oglesby, Larry Norman, Sinclair Bacon, Rodney Howard, Dale Reese, and Christopher Atkinson.  In addition, Jimerson accuses Local 1423 president, Winford Hill, and the business agent, Reid, of ignoring her complaints of harassment and retaliating against her for bringing the complaint.

Jimerson claims that she was subjected to repeated physical threats at the workplace by Leonard "Lee" Butler.

4

During Jimerson's deposition, she admitted that, in 1996, she had a two month relationship with Leonard Butler, during which time they lived together.  According to Jimerson, Butler began harassing her in June 2000, when she began working as a longshoreman.

Shortly after August 24, 2000, Butler followed Jimerson around, yelling: "Don't take your ass to Savannah taking jobs you can't do.  You're fucking up my job."  Dkt. No. 47, Ex. M. Jimerson had worked with tractors in Savannah on August 24, 2000, and she alleged that Butler suggested that she was incapable of doing this work because of her sex.

Jimerson also faulted Butler for acting belligerently on other occasions, by screaming at her, yelling obscenities, and attempting to intimidate her by driving forklifts close to her person.  From June 2000 through 2002, Jimerson contends that Butler attempted to run her down with a forklift on at least fifteen occasions.  During Jimerson's deposition, she testified that Butler came close to hitting her and that his actions made her afraid.

According to Jimerson, Butler further stated that Jimerson "ain't nothing but a notch in my belt[,]" and that he "fucked [Jimerson] the day he met [her]."   Dkt. No. 47, Ex. M.

Relatedly, Dale Reese stated that "Lee told the guys he was banging your back out," and repeated Butler's boast that he had slept with Jimerson on the day they met.  Dkt. No. 47, Ex. M. Jimerson also reported that Butler stated to her that "If anyone writes me up for sexual harassment, they won't be working down here."  Dkt. No. 47, Ex. L at 9.

Nonetheless, twice during this time period, Jimerson allowed Butler to come over to her home for dinner. According to Jimerson, Butler invited himself to her home, and she agreed on both occasions.  On one such occasion, Jimerson's friend (and future husband), Lonnie Jimerson,[1] helped her prepare the meal.  As Jimerson explains it, her hospitality was limited to speaking to Butler with the hope that she could convince him to discontinue his reckless and offensive behavior toward her on the job.   Notwithstanding their previous romantic involvement, Jimerson avers that Butler's harassment of her was based on her being a woman, not because of their personal history.

On December 15, 2000, Jimerson alleges that a fellow laborer, Wanda Richardson, and the header on a job site, Willie

---

[1]

Plaintiff's name was Rhonda Fagan at that time, but the Court refers to her as "Rhonda Jimerson" throughout the order for the sake of convenience and consistency.

"Bait" Bacon, approached her.   Richardson told Jimerson that Bacon would pay Jimerson five hundred dollars in return for sexual favors.   Richardson stated that all Jimerson would have to do was "take Bait back in the hole," and pointed to a stairwell, explaining that it would only take Jimerson five minutes. Dkt. No. 47, Ex. M.

Jimerson posits that Richardson made these comments at Bacon's behest.   When Jimerson declined Bacon's advances, Jimerson stated that Bacon became upset and engaged in other acts of harassment against her.   Specifically, twelve days later, Bacon stated that Jimerson did not have on steel-toed shoes, and although Jimerson told Bacon that she did have on such shoes, Bacon proceeded to cut her shoes from end to end, ruining them.

On February 28, 2001, and October 13, 2001, Jimerson avers that her supervisor, Terrell Carmena, made lewd, sexually derogatory comments to her and sexually propositioned her.   In February 2001, Carmena told Jimerson that he would "lick her pussy to her asshole so good you'll look for me in the daytime with a flashlight." Dkt. No. 47, Ex. M.   In October of that year, Carmena was in a station wagon with a group of longshoremen, including Jimerson, and he stated that "some

7

women claim they don't suck on brown apples, when they do it all." When one of Jimerson's co-workers protested that "Rhonda doesn't need to hear that," Carmena responded that "she's the main one I'm talking about. I know she's doing it, too." Dkt. No. 47, Ex. M.

Jimerson reports that a fellow worker, Maurice Butler, made sexually suggestive comments to her around March 2003. Specifically, Butler told Jimerson that Geraldine Miller "told me you come in your pants whenever you see me." On another occasion, Butler propositioned Jimerson, stating that she should move in with him and "get in one of his beds." Dkt. No. 47, Ex. M. Thereafter, Butler began hitting her on top of her hard hat every time she came aboard a paper ship. Jimerson contends that these physical invasions would not have occurred had she accepted Butler's sexual advances. As additional instances of harassment, Jimerson reported that Carmena and Maurice Butler attempted to get others to fire her from jobs, or to refuse to hire her at all.

Jimerson related that Willie Merrell, a header, also harassed her. On November 2, 2004, Merrell told Jimerson that "If Lonnie isn't acting right, I'll be glad to step in and tighten you up." Dkt. No. 47, Ex. M. Merrell also told

Jimerson that he was "harder than the tractors on the ship. If Lonnie can't get you pregnant, I can." Dkt. No. 47, Ex. M.[2]

Jimerson, who is black, asserts that on October 30, 2004, and on several other occasions, Max Mango made harassing remarks to her about "what he'd like to do with some chocolate swirl." Dkt. No. 47, Ex. M. Jimerson also relates that Mango attempted to rub her leg and tried to hold her hand on several different occasions. In Jimerson's affidavit, she stated that Mango continued his unwanted touching of Plaintiff, even after she directed him to stop.

Similarly, Jimerson accuses Samuel Oglesby, a member of the union's Executive Board, of grabbing her hand and holding it, while they were riding in a station wagon, for a period of five to fifteen minutes. Jimerson contends that this conduct occurred repeatedly during 2002, 2003, and 2004. Although Jimerson told Oglesby that this made her feel uncomfortable and that it was unwelcome, he continued this behavior until the union's lawyer spoke to the longshoremen on August 22, 2005. On that day, Fletcher Farrington advised the longshoremen that

---

[2] This comment was made by Merrell when he was Jimerson's co-worker, not a header, and occurred during late 2003.

sexual harassment is unlawful, and that they were not permitted to retaliate against Jimerson for filing the instant lawsuit.

Jimerson contends that, on numerous occasions in the union hall, Local 1423 chaplain and Executive Board member Rodney Howard blew in her ear. Although she protested and walked away when Howard engaged in this conduct, Jimerson stated that he only stopped this activity about the time it was announced that she was suing for sexual harassment.[3]

Jimerson asserts that on other occasions, men made sexually explicit remarks to her, which were often related to her sexual practices. On June 15, 2004, Jimerson was asked by Larry Norman, an Executive Board member, if she "sucked dicks," and he also stated that she came to work wearing a G-string with her pants unzipped. Dkt. No. 47, Ex. L at 24 & Ex. M.

According to Jimerson, header Christopher Atkinson also harassed her. On multiple occasions, Atkinson would state to Jimerson: "I sure do want to get with you. I want you to get rid of your stepdaddy. I should be your stepdaddy. Whoo Whoo. I su' like that." Dkt. No. 47, Ex. M. On August 5, 2005, Atkinson told Jimerson that she had a "hot box," which Jimerson

---

[3]

    During Jimerson's second deposition, she stated that she believed her husband may have said something to Howard that caused him to cease harassing Plaintiff.

understood to be a reference to her vagina.  Jimerson Dep. 233-34 (Jan. 18, 2006).

Jimerson reported that on October 4, 2004, and on April 18, 2005, Sinclair Bacon stated that she had sex with her ex-husband's best friend, which caused her spouse (or former spouse) to start drinking.  Although Jimerson denied it, and told Bacon to quit saying such things, he continued making such statements at the workplace.

Jimerson has stated that there were other incidents of harassment by these men, and that the harassment occurred on a daily or weekly basis through 2005, and into 2006.  For example, Jimerson stated in a form that she submitted to the Equal Employment Opportunity Commission that Mango propositioned her every day.  She has made similar claims of ongoing harassment against Willie Bacon, Leonard Butler, Maurice Butler, Carmena, Merrell, and other longshoremen.

According to union President Hill's affidavit, the union's officers run the union, but its Executive Board members participate in major decisions affecting the union.  Local 1423's bylaws and the collective bargaining agreement provide that complaints of harassment must be reported either to the header, the union office, or to the union's officers.  Jimerson

AO 72A
(Rev. 8/82)

maintains that her repeated complaints about sexual harassment to Hill and Reid were ineffective, and led to retaliation against her, including a suspension, one occasion where Jimerson was fired from a job, and multiple instances of being passed over for work in violation of union seniority rules.

On December 26, 2003, Jimerson did not show up for work, or call and let anyone know that she would be absent. Header Matthew Hall initiated the grievance against Jimerson concerning her absence, and although Jimerson explained to union officials that she had a flat tire and that no one was available for her to call, the union decided to suspend her for seven days. After Jimerson appealed her suspension to the Port Grievance Committee, the suspension was lengthened to fourteen days. Jimerson asserts that the decision to suspend her was made in retaliation for her opposition to sexual harassment on the job.

On October 6, 2004, Jimerson complains that another instance of retaliation occurred based on her complaints to Hill and Reid. Jimerson related that a header, Fred Sams, hired her to operate a forklift on this day. Although Jimerson insists that she was a qualified and certified forklift operator, Sams fired her an hour later. Relatedly, Jimerson

AO 72A
(Rev. 8/82)

avers that she was retaliated against on other occasions in 2004 by George Mincey and Edward Chandler, when these headers failed to hire her in accordance with the union's seniority rules.


## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in his favor. . . ", United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991)(en banc)(internal quotation marks omitted).

13

## DISCUSSION

### I.   Hostile Work Environment

Previously, the Court found that genuine issues of material fact remain in dispute regarding whether Jimerson experienced a hostile work environment. <u>See</u> Dkt. No. 40 at 18-27.   Defendant renews its disagreement with that holding, arguing that the harassment experienced by Jimerson was not severe or pervasive; that the harassment did not affect her work adversely, or would not have affected the work of a reasonable person adversely; and that Jimerson's failure to use its internal grievance process precludes her claim.   After reviewing these arguments, the Court concludes that its previous determination remains sound.

### A.   Whether the Harassment Was Severe or Pervasive

First, the union insists that Jimerson did not experience severe or pervasive harassment at work.   In making this argument, Defendant relies heavily on <u>Breda v. Wolf Camera, Inc.</u>, 148 F. Supp. 2d 1371 (S.D. Ga. 2001).   Yet, as Plaintiff has noted, Defendant's reliance on <u>Breda</u> is misplaced, because Jimerson's allegations of sexual harassment are more extreme

14

and widespread than the conduct at issue there. <u>See</u> <u>id</u>. at 1375-82.

The other decisions cited by the union are also distinguishable because they involved instances of harassment that were less serious and/or less extensive. <u>See</u> <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1245-52 (11th Cir. 1999)(en banc); <u>Andusumilli v. City of Chicago</u>, 164 F.3d 353, 361-62 (7th Cir. 1998)(isolated instances of coworkers' touching the plaintiff's arm, fingers, and a "relatively mild . . . poke" in the buttocks, not actionable); <u>Saxton v. Am. Tel. & Tel. Co.</u>, 10 F.3d 526, 534-35 (7th Cir. 1993); <u>Shesko v. City of Coatsville</u>, 292 F. Supp. 2d 719, 725-26 (E.D. Pa. 2003); <u>DeCesare v. Nat'l R.R. Passenger Corp.</u>, Civ. A. 98-3851, 1999 U.S. Dist. LEXIS 7560, at *3-*4 (E.D. Pa. May 24, 1999).

The union focuses much of this portion of its brief on the viability of Jimerson's complaints against Leonard Butler. While it is true that the union may be able to convince a jury that certain conduct by Butler was motivated by their past romantic involvement, not by Jimerson's sex, the Court cannot find as much as a matter of law. <u>See</u> <u>Succar v. Dade County Sch. Bd.</u>, 229 F.3d 1343, 1345 (11th Cir. 2000)(a personal feud is not sex discrimination); <u>see</u> <u>generally</u> <u>EEOC v. Nat'l Educ.</u>

15

Ass'n, 422 F.3d 840, 844-47 (9th Cir. 2005)(analyzing "because of sex" prong, finding question of fact where supervisor was belligerent toward men and women).

In contrast to Succar, there is some evidence that Butler harassed Jimerson for taking certain jobs because she was a woman.[4]  If Butler's harassment of Jimerson was motivated by her refusal to have a sexual relationship with him, as Plaintiff asserts, he does not get a "free pass" for such conduct simply because he once had a romantic relationship with her.  E.g., Schrader v. E.G. & G., Inc., 953 F. Supp. 1160, 1167-68 (D. Colo. 1997); Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1247 (11th Cir. 1998)(quid pro quo claims).

In any event, beyond Jimerson's averments against Leonard Butler, her other allegations demonstrate a triable issue of fact on her hostile work environment theory.  According to the union's count, Jimerson's male supervisors and coworkers

---

[4]    The union also makes light of Butler's proclivity for driving the forklift close to Jimerson's person, calling it "juvenile horseplay." However, if Jimerson's testimony is believed, Butler was operating the forklift equipment in a reckless manner and her physical well-being was at risk.  She asserts that she had a good reason not to "jump" out of the way, namely, that it would have encouraged Butler to continue this conduct.  The fact that Jimerson testified that Butler was "playing games" is not inconsistent with her representation that such conduct was dangerous, with serious possible consequences to her life and limb.

propositioned her for sex on seven different occasions. Jimerson also reported experiencing unwelcome touching by supervisors and coworkers on a multitude of occasions, including repeated blowing in her ear, forced hand holding, being struck on the head, and attempts to rub her leg. She further stated that her coworkers and supervisors made lewd, sexually suggestive remarks to her incessantly. On other occasions, Jimerson alleges that she was subjected to threats of retaliation due to her failure to accede to sexual demands, or for her complaints of sexual harassment. Jimerson has alleged "extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated" Jimerson's work environment. Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264 (5th Cir. 1999).

Local 1423 also faults Jimerson for providing a "laundry list" of foul language and coarse behavior that does not rise to the level of creating a hostile work environment. Yet, this criticism misses the mark. For the most part, Jimerson listed every last complaint regarding her co-workers' conduct at Defendants' counsel's insistence, over the course of two separate seven-hour depositions. The fact that she listed instances of rude treatment not constituting unlawful

discrimination does not in any way "dilute" or diminish her serious contentions of sexual harassment on the job, as the union suggests.

The union has offered no reason for the Court to alter its conclusion that Jimerson may have experienced severe or pervasive sexual harassment on the job, entitling her to a jury trial.

**B.   Whether Jimerson Was, or a Reasonable Person Would Have Been, Affected Detrimentally by the Harassment**

Second, Defendant contends that Jimerson was not affected adversely by any harassment, and that a reasonable person would not have been bothered by the workplace conduct she experienced.   The union posits that because Jimerson missed no time from work, did not seek medical treatment for her work-related stress,[5] and because her quality of work did not suffer, the harassment did not alter the terms or conditions

---

[5]   According to Plaintiff's deposition testimony, she did consult with a mental health doctor about her problems on the job and the difficulties it caused her.   Jimerson Dep. 260-61 (Jan. 18, 2006).   Defendant has recognized that the Court, and it, must accept Plaintiff's version of the facts as true for the purposes of this motion.   Dkt. No. 45 at 3 n.1. Given this, it is difficult to see why Defendant would misstate the facts of the case in attempt to prevail on summary judgment.   Dkt. 54 at 6-7. Still, this particular bit of chicanery might not bear mentioning, except that Defendant's counsel made a habit of accusing Plaintiff's lawyer of distorting the record evidence, without justification.   See also Dkt. No. 54 at 4 n.1.

of her employment.  See Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 23 (1993)(to constitute a hostile work environment, the workplace must be objectively and subjectively offensive).[6]

Yet, contrary to the union's representation, Jimerson did talk to a psychologist, Dr. James Lanier, about the emotional turmoil that the harassment caused her.  Moreover, according to Jimerson's affidavit, she experiences crying spells at night, has trouble sleeping, and is losing her hair, all due to stress caused by workplace discrimination.  Plainly, if what Jimerson alleges is true, this would be sufficient to entitle her to recover.  Burlington N. & Sante Fe Ry. v. White, No. 05-259, 2006 U.S. LEXIS 4895, at *35 (June 22, 2006).

However, Local 1423 asserts that Jimerson did not name Dr. Lanier in a timely fashion, so that it could obtain appropriate discovery from him.  The Court agrees that Jimerson is at fault for delay, and the union may take out of time discovery, as necessary to prepare its defense.  See Dkt. No. 37 at 2. Nonetheless, summary judgment is not an appropriate sanction

---

[6]

    For the sake of completeness, the Court notes that "interference with the employee's work performance" is merely one factor that the Court is to evaluate.  Attention must also be given to the frequency of the discriminatory conduct; the severity of that conduct; and whether it is "physically threatening or humiliating, or a mere offensive utterance." Id.  No one factor is determinative in the analysis. Id.  For an extended assessment of the governing standards of law, as they relate to this case, see Dkt. No. 40 at 18-27.

to punish Plaintiff for her disregard of the Court-imposed discovery deadline. "The trial court . . . has wide discretion in setting the limits of discovery, and its decisions will not be reversed unless a clearly erroneous principle of law is applied, or no evidence rationally supports the decision." Moore v. Armour Pharm. Co., 927 F.2d 1194, 1197 (11th Cir. 1991).

Significantly, Jimerson did allude to Lanier's existence, and her consultation with him, during her deposition. Therefore, the existence of this witness was known by Defendant prior to the close of discovery. Had the union made a concerted effort, it could have determined the doctor's identity sooner than it did in this case. While this does not excuse Jimerson's failure to comply with the disclosure deadline, it does counsel against rejecting the evidence out of hand, as Defendant suggests. The Court will consider informing the jury of Jimerson's failure to make the disclosure in a timely fashion, in accordance with Federal Rule of Civil Procedure 37(c)(1), or any other appropriate sanction suggested by Defendant.

Furthermore, Defendant argues that the Court may not consider Jimerson's affidavit because it was offered after her

AO 72A
(Rev. 8/82)

deposition was given and it "contradicted" that testimony.  The Court disagrees with Defendant's characterization of the affidavit as a "sham" affidavit offered for an improper purpose.  This is not a case where a non-movant has submitted a self-serving affidavit with a conclusory statement that is inconsistent with clear deposition testimony.  Under those circumstances, a later affidavit cannot create a genuine issue of fact for trial.  E.g., Lowie v. Raymark Indus., 676 F. Supp. 1214, 1216-17 (S.D. Ga. 1987); Van T. Junkins & Assoc., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984); Kennett-Murray Corp., v. Bone, 622 F.2d 887, 893-95 (5th Cir. 1980).[7]

Certainly, Jimerson's affidavit added to, and clarified, her deposition testimony, but it was not inconsistent with her previous testimony.  The affidavit was not conclusory, as it set out her physical ailments specifically, and named the psychologist that she had mentioned in her deposition.  There was nothing improper about her offering it into evidence in opposition to Defendant's motion, and it is admissible.  See Fed. R. Civ. P. 56(e).

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

21

While Jimerson concedes that some of the off-color remarks and lewd conduct reported during her deposition do not constitute discrimination based on sex, she argues that other specific conduct and statements could be found to be unlawful harassment. As explained above, the Court agrees. It cannot be said, as a matter of law, that the acts detailed by Jimerson would not have had a detrimental effect on a reasonable person.

## C.   Whether Local 1423's Grievance Process Precludes Jimerson's Claim

Third, Local 1423 renews its argument that Jimerson failed to follow its grievance procedure correctly, and did not file complaints each time she experienced harassment. As the union notes, on two occasions in which Jimerson invoked the grievance process for sexual harassment at the workplace, the offenders were punished. Maurice Butler was suspended for ninety days, and Terrell Carmena was suspended for thirty days and was barred from his header position indefinitely. The union submits that Jimerson's failure to utilize the union's internal grievance process precludes her sexual harassment claim.

Jimerson rejoins that the union's grievance procedure was ineffective. When she complained to Reid and Hill in 2000 and 2001 about the behavior of Carmena and Leonard Butler, she

22

asserts that she was laughed at, and that nothing was done to punish either man.   In 2001, members of the union's Executive Board asked her to drop a grievance against Carmena, and promised that the Board would ensure that his harassing behavior would cease.    Nonetheless, the discrimination continued.    Moreover, Jimerson asserts that Carmena's suspension was caused by his disorderly conduct in the union hall towards Reid, not due to her complaints.

The record evidence is inconclusive regarding the specific cause of Carmena's suspension.  The minutes from the Seniority Board meeting indicate that four complaints were scheduled to be heard against Carmena on the day in question, and that the Board felt compelled to take action immediately, lest his behavior continue.  Dkt. No. 47, Ex. B at 2.  In addition to the complaint of Jimerson, about repeated abusive language and threats toward a group of women of which she was a member, Carmena also faced a complaint from Reid.  Reid reported that Carmena engaged in disorderly conduct in the union hall, and that Carmena held Reid in Reid's office by force.  Reid summoned the police in response.  In addition, two other longshoremen stated that Carmena had engaged in improper hiring practices.  Dkt. No. 47, Ex. B at 2-3.

AO 72A
(Rev. 8/82)

Consequently, the record evidence appears to provide limited support to both parties about the reason for Carmena's suspension. The significance, and proportionality, of the union's response to Jimerson's remonstrations about Carmena is a matter for the jury to determine.

As the union notes, employees have a responsibility to report harassment and participate in the union's efforts to investigate and remediate. However, Jimerson urges that her repeated written and oral complaints were not just ignored by the union's officers, but that she faced increased harassment and retaliation because she complained. Jimerson reported that other longshoremen were emboldened to begin harassing her because they saw that nothing was done to the other men who engaged in this conduct. Drawing all justifiable inferences in Jimerson's favor, she had a legitimate fear that she would continue to face sexual harassment, and that she would not be hired in accordance with the seniority rules, if she persisted in bringing her complaints to the union leadership.

Previously, the Court held that whether Jimerson's compliance with the union's grievance procedure was reasonable is a question of fact. See Dkt. No. 40 at 18 n.2 & 28-31; see also Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1314-

AO 72A
(Rev. 8/82)

16 (11th Cir. 2001); <u>Breda v. Wolf Camera & Video</u>, 222 F.3d 886, 890 (11th Cir. 2000). The union has provided no basis for the Court to revisit or modify this conclusion, either under the law, or the facts as they have been revealed through discovery.

If the jury credits Jimerson's testimony, she faced repeated, credible threats of retaliation. <u>Walton v. Johnson & Johnson Servs., Inc.</u>, 347 F.3d 1272, 1290-91 (11th Cir. 2003). There is some evidence that Jimerson's complaints of harassment were ignored by Hill and Reid, and that these complaints resulted in increased, or at least unabated, sexual harassment by union members. <u>See</u> <u>Caridad v. Metro-North Commuter R.R.</u>, 191 F.3d 283, 295 (2d Cir. 1999)(cited by <u>Walton</u>; requiring a "credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action.").

As a result, <u>Walton</u> does not control the outcome in the case <u>sub judice</u>. Because Willie Bacon, Carmena, and Merrell were Jimerson's supervisors, it is the union's obligation to prove that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and . . . that the plaintiff employee <u>unreasonably</u> failed to take advantage of any

AO 72A
(Rev. 8/82)

preventive or corrective opportunities[.]" <u>Burlington Indus.,</u> <u>Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998)(emphasis added). The union has not established this affirmative defense as a matter of law.

Regarding the actions of Jimerson's co-workers, Leonard Butler, Maurice Butler, Sinclair Bacon, Mango, Atkinson, Reese, Norman, Oglesby, and Howard, Jimerson presented some evidence that union officials knew, or should have known, about their harassment. The union may have constructive notice of harassment when it occurs daily, in the presence of others, including union officers or other responsible officials in the organization. <u>Miller v. Kenworth of Dothan, Inc.,</u> 277 F.3d 1269, 1278-79 (11th Cir. 2002). If the jury credits Jimerson's version of the events, it may determine that Local 1423 acted negligently in failing to correct the harassment Jimerson experienced at the hands of her co-workers. <u>Breda</u>, 222 F.3d at 889.

Summary judgment is not warranted in Local 1423's favor on Jimerson's hostile work environment theory.

26

## II.  <u>Retaliation</u>

To make out a prima facie case of retaliation, Jimerson must show (1) that she made some statutorily protected expression, (2) that the union discriminated against her, and (3) a casual link between the protected expression and the discrimination.  <u>Burlington N. & Sante Fe Ry. v. White</u>, No. 05-259, 2006 U.S. LEXIS 4895, at *12-*29 (June 22, 2006). While the retaliation need not be "work-related," it is not actionable unless the action is one that would be "materially adverse to a reasonable employee." <u>Id</u>. at *8.

According to Jimerson, she was retaliated against by five different headers.  More specifically, Jimerson was suspended for fourteen days, passed over for work in violation of the seniority rules, fired from a job, and a supervisor ruined her work boots.

The union contends that there is no temporal nexus between any of Jimerson's protected conduct and any adverse employment action.  Additionally, the union maintains that Jimerson cannot prove that any of the decision-makers had notice of her protected activity.  <u>Brungart v. BellSouth Telecomms., Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2004) (decision-maker must be aware of protected activity); <u>Clover v. Total Sys. Servs.</u>,

27

Inc., 176 F.3d 1346, 1355-56 (11th Cir. 1999)("A jury finding . . . must be supported by reasonable inferences from the evidence, not mere speculation.").

Indeed, where there is a substantial gap in time between a plaintiff's protected activity and the adverse employment action (or other discrimination), courts refuse to infer causation.  "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close[.]'" Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001)(citations omitted); Higdon v. Jackson, 393 F.3d 1211, 1221 (11th Cir. 2004)(three months between protected activity and retaliation is too long to infer causation).  In light of these authorities, and the undisputed facts, the Court concludes that Jimerson's complaints of unlawful retaliation are insufficient to withstand summary judgment.

As a result of the grievance filed by Matthew Hall on January 6, 2004, Jimerson was suspended for fourteen days from work.  Jimerson asserts that Hall filed this grievance at President Hill's urging.  Hall denies that he was put up to the

task by Hill, or any other union officer.   There has been no allegation, or indication, that Hall was acting as the union's agent when he told Jimerson that Hill asked him to file the grievance.   See Rowell v. BellSouth, 433 F.3d 794, 800-801 (11th Cir. 2005); Fed. R. Evid. 801(d)(2)(D).[8]   As a result, this hearsay evidence is inadmissible to support Jimerson's retaliation claim.

Moreover, there is no evidence that Hall had knowledge of any complaints by Jimerson of sexual harassment, and Jimerson has failed to identify any protected conduct that occurred near the time when Hall's filed his grievance.   The most proximate identified complaint was more than five months old, involving oral reports by Jimerson to Hill and Reid.   There is no allegation that Hall knew about these distant grievances, or that Hall's grievance was motivated by these complaints.   In short, Hall's grievance does not constitute an actionable instance of retaliation.

On July 1, 2004, Jimerson avers that Edward Chandler refused to hire her, as he was required to do under the union's seniority rules.   She makes similar allegations against George

---

[8]
    That rule provides that a statement is not hearsay if it "is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."

29

Mincey and Fred Sams, with respect to events occurring on August 8, 2004, and October 6, 2004, respectively. However, Jimerson has failed to identify any protected conduct that she engaged in during 2004, of which these men were aware. Instead, Jimerson identifies an incident occurring on September 5, 2003, when Maurice Butler was suspended for ninety days due to Jimerson's complaints of harassment. While Chandler, Sams, and Mincey knew of this incident, they have each provided affidavits stating that this event did not affect their hiring decisions. Jimerson has produced no evidence to the contrary.

Because there is no evidence that any of the men took any employment action based on Jimerson's complaints of harassment, Jimerson's complaints of retaliation with respect to these men must fail. Without a closer temporal nexus between the knowledge of protected conduct and the purported discrimination, causation cannot be inferred. As mentioned above, long time lapses of three months or more do not permit an inference of causation. Higdon, 393 F.3d at 1221; compare Clark County Sch. Dist., 532 U.S. at 274 ("Action taken . . . 20 months later suggests, by itself, no causality at all.") with Goldsmith v. City of Atmore, 996 F.2d 1155, 1163-64 (11th Cir. 1993)(temporal proximity combined with knowledge of

AO 72A
(Rev. 8/82)

protected conduct sufficient to create a jury question regarding causation).

Jimerson also asserts a retaliation claim relating to an action taken by Willie Bacon. Specifically, Jimerson refused Bacon's request for sex on a job site, and twelve days dater, Bacon cut her work boots. This claim fails because, <u>inter alia</u>, there is no allegation that Jimerson complained to anyone about Bacon's improper sexual advance in the interim period. As the Supreme Court has explained: "The substantive provision [of Title VII] seeks to prevent injury to individuals based on who they are, <u>i.e.</u>, their status. The anti-retaliation provision seeks to prevent harm to individuals based on what they do, <u>i.e.</u>, their conduct." <u>White</u>, 2006 U.S. LEXIS 4895, at *18.

There is no evidence that Jimerson was retaliated against by Bacon for engaging in protected conduct, e.g., a complaint to a superior that she had been sexually harassed. While there is a temporal nexus between the two events, Bacon's action in cutting the boots, supposedly out of spite for Jimerson's refusal to have sex with him, is merely cumulative proof of her hostile work environment claim.

In sum, Defendant is entitled to judgment as a matter of law with respect to Jimerson's complaints of retaliation.

## CONCLUSION

For the reasons explained above, Defendant's motion is **DENIED** as to the hostile work environment-sexual harassment claim, but **GRANTED** as to the retaliation claims.  Dkt. No. 45.

**SO ORDERED**, this ___18th___ day of July, 2006.


JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

32